# IN THE UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| In re: <br><br> JOHN J. GROCHOLL, <br>                                Debtor. | Chapter 7 <br><br> Case No. 04 B 71683 |
| Durand State Bank, an Illinois Banking Corporation, <br>                                Plaintiff, <br> v. <br> John J. Grocholl, <br>                                Defendant. | Adv. No. 04 A 7073 |

## MEMORANDUM OPINION FINDING DEBTS NOT EXCEPTED FROM DISCHARGE PURSUANT TO SECTIONS 523(a)(2)(A) AND (a)6)

This matter comes before the Court on the adversary complaint brought by the plaintiff, Durand State Bank (the "Bank"), an Illinois Banking Corporation, against the debtor, John J. Grocholl (the "Debtor"). An evidentiary hearing was conducted on May 28, 2005. The Bank is represented by Attorney Andrew Smith and the Debtor is represented by Attorney Mary Gorman. Having considered the testimony of the witnesses, exhibits presented and arguments of counsel in addition to the post-hearing proposed findings of fact and conclusions of law submitted by the parties, this Court finds that the debt is not excepted from discharge pursuant to §§ 523(a)(2)(A) and (a)(6).

## JURISDICTION

This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

**FINDINGS OF FACT**

1. The Debtor and his brother, Matthew Grocholl, borrowed $130,080.00 from the Bank on or about April 27, 2001, using the business name Grocholl Farms. (Plaintiff's Exhibit 1A). Evidence was presented that this loan has been paid in full. (Tr. at 11.)

2. The Debtor borrowed $399,721.43 from the Bank in his individual name pursuant to the terms of a Note and Security Agreement dated January 17, 2002. (Plaintiff's Exhibit 1B). No evidence was presented as to any balance which remains due with respect to this Note.

3. The Debtor borrowed $70,200.14 from the Bank in his individual name pursuant to the terms of a Note and Security Agreement dated April 12, 2002. (Pl. Ex. 1C.) No evidence was presented as to any balance which remains due with respect to this Note. (Tr. at 16.)

4. J&O Welcome Meadows borrowed $8,040.00 from the Bank on May 28, 2002, pursuant to the terms of a Note and Security Agreement executed by both the Debtor and Owen Mathieu. (Pl. Ex. 1D.) Evidence was presented that the Note was paid in full. (Tr. at 16.)

5. J&O Welcome Meadows borrowed $120,000.00 from the Bank on June 14, 2002, pursuant to the terms of a Note and Security Agreement executed by both the Debtor and Owen Mathieu. (Pl. Ex. 1E.) No evidence was presented as to the amount that remains due on this note.

6. J&O Welcome Meadows borrowed $188,040.00 from the Bank on August 2, 2002, pursuant to the terms of a Note and Security Agreement executed by both the

2

Debtor and Owen Mathieu. (Pl. Ex. 1F.) No evidence was presented as to the amount that remains due on this note.

7. Janice Klever is a loan officer at Durand State Bank and was involved in all of the loans made by the Bank to the Debtor and J&O Welcome Meadows. (Tr. at 68-71.)

8. Janice Klever testified that part of the basis for approving the aforesaid loans was her on-going relationship with the Debtor. (Tr. at 71.)

9. Janice Klever considered all of the loans to be secured and that the security provided was in the nature of cows and farm equipment. (Tr. at 72.)

10. Ms. Klever was unable to explain why the Bank's files did not contain a personal financial statement with respect to the loan issued in early 2001 nor could she recall whether an individual financial statement was tendered by the Debtor when funds were made available on the $399,000 note. (Tr. at 85-86.)

11. Ms. Klever could not recall whether a personal financial statement was obtained prior to the statement dated January 2002. (Tr. p. 86.)

12. A financial statement received by the Bank from the Debtor dated February 28, 2002, references Welcome Meadows, LLC rather than the Debtor individually (Pl. Ex. 4.)

13. After she received the financial statement referencing Welcome Meadows LLC, Ms. Klever did not inquire as to the substantial differences in assets and liabilities shown on the exhibit as compared to the Debtors' personal financial statement. (Tr. at 89).

14. Despite Ms. Klever's acknowledgment that she should have been concerned about an additional $368,000 debt owing to another bank listed on the Welcome Meadows, LLC financial statement, she did not recall having any discussion with the

3

Debtor concerning it. (Tr. at 71.)

15. The Bank continued to receive financial information from Welcome Meadows, LLC, including a net worth statement dated May 28, 2002, and a net worth statement dated July 29, 2002. (Pl. Exs. 5 and 6.)

16. Ms. Klever had no specific recollection of conversations with the Debtor wherein he represented anything specific about the financial statements or whether she inquired regarding the ownership of assets and liabilities shown on the financial statements. (Tr. at 75-76, 93, 129-130.)

17. All loans made during or after May of 2002, were made in the name of Welcome Meadows, LLC and contained the signatures of both the Debtor and Owen Mathieu. (Pl. Exs. 1D, 1E and 1F; Tr. at 96-97, 99-100, 104-105.)

18. Janice Klever never required the Debtor or Owen Mathieu to produce proof of the existence of any LLC nor did she undertake any search of the records of the Illinois Secretary of State's office to determine the status of J&O Welcome Meadows. (Tr. at 99-105.)

19. The farmer individual financial statements dated July 29, 2002, (Pl. Ex. 7), contained exactly the same information as the J&O Welcome Meadows' net worth statement of the same date and specifically refers to the Debtor's separate personal financial statement. Ms. Klever has no specific recollection of any conversation with the Debtor regarding these documents. (Pl. Exs. 6 and 7; Tr. at 114-117, 129-130).

20. The only information David Nosbisch, the president of the Bank, recalled from conversations with the Debtor was that the last loan issued was for feed purchase and was necessary for cash flow purposes. (Tr. at 153.)

21. Mr. Nosbisch did not testify regarding any alleged misrepresentations made by the Debtor to the Bank.

22. Dan Bement became involved in the Welcome Meadows' farming venture with the Debtor in the fall of 2001. Copies of cashiers checks totaling $165,000 represented the funds provided by Dan Bement to purchase cows that became part of the Welcome Meadows farming operation. (Def. Ex. 5; Tr. at 157, 163.)

23. Mr. Bement testified that he never removed any of the cows purchased with his funds and that all such cows remained part of the J&O Welcome Meadows herd, which was ultimately liquidated, and the bulk of proceeds were paid to secured creditors, Durand State Bank and M & I Bank. (Tr. at 164, 171.)

24. Mr. Bement received $5,000 out of said liquidation in return for his $165,000 investment. (Tr. at 170-171.)

25. Mr. Bement further testified that in late 2002 the farm operation encountered problems when many cows became sick and died. He testified as to efforts that were made with consultants and veterinarians to correct the problem and that Janice Klever, on behalf of the Bank, attended at least one of the forums where such matters were dealt with. (Tr. at 166-171.)

26. The Debtor gave credible testimony concerning financial statements which were periodically sent to the Bank for the Welcome Meadows or J & O Welcome Meadows' operations, wherein he disclosed on a regular basis market dairy and breeding dairy sales which are common terms for the sale of culled cows. (Tr. at 193, 197, 204.)

27. The Debtor further provided uncontradicted testimony that neither Janice

5

Klever nor anyone else on behalf of the Bank ever questioned him concerning these sales even though they were regularly disclosed. (Tr. at 204-206.)

28. No evidence was presented regarding the fair market value of cows allegedly sold in violation of the Bank's security agreements. The Bank's security agreements allow for the sale of inventory by the Debtor in the ordinary course of business. (Pl. Ex. 1A -1F).

## DISCUSSION

**Count I - 523(a)(2)(A)**

Count I is brought under § 523(a)(2)(A) of the Bankruptcy Code which provides in relevant part as follows: "A discharge does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by– (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*, 895 F.2d 1170 (7th Cir. 1990). The burden of proof required is a preponderance of the evidence. *Grogan v. Garner*, 498 US 279 (1996). To further the policy of providing a debtor a fresh start in bankruptcy, exception to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Scarlata*, 979 F.2d 521 (7th Cir. 1992).

Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses and false representation. In order to except false pretenses or a false representation from dischargeability, the plaintiff must establish the following elements: 1) the defendant obtained funds through representations that the plaintiff either know to be false, or made with such reckless disregard for the truth as to

6

constitute willful misrepresentations; 2) the defendant possessed the requisite scienter, i.e. he actually intended to deceive the plaintiff; and 3) the plaintiff justifiably relied on the misrepresentation to his detriment. *In re Jairath* 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001). The element of justifiable reliance requires that a person "use his senses and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field v. Mans*, 116 S.Ct. 437, 444 (1995).

The Seventh Circuit has stated that there is "no definite and invariable rule which can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated. *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000). Therefore, a misrepresentation and reliance thereon is not always required to establish actual fraud. Thus, a different analysis may be used when a plaintiff alleges actual fraud. The plaintiff must allege: 1) a fraud occurred; 2) the debtor was guilty of intent to defraud; and 3) the fraud created the debt that is the subject of the discharge dispute. *Id.* Omissions or failure to disclose to a creditor relevant and necessary information can constitute misrepresentations under § 523(a)(2)(A).

The Bank failed to establish by a preponderance of the evidence that the Debtor obtained the funds by false pretenses, a false representation or actual fraud. The first loan the Debtor obtain with his brother under the name Grocholl Farms and was used to purchase approximately 90 cows. Those cows were kept on their property until taken to market. (Tr. at 9-11.) The Debtor's next loan, in the amount of $399,000 was to purchase cows to start a dairy farm business with Owen Mathieu and to keep them at the Mathieu farm. (Tr. at 12.) Debtor presented the Bank with a Welcome Meadows

7

Dairy Venture Financial Statement dated September 4, 2001. (Pl. Ex. 2.) This document indicated there were 200 cows. The Debtor testified that this document was his proposal to the Bank, not a representation that he owned 200 cows at that time. (Tr. at 20, 191.) Various additional documents were entered into evidence, including the Debtor's individual financial statement (Pl. Ex. 3.) and Welcome Meadows LLC FBFM net worth statement (Pl. Ex. 4). While written statements may often accompany verbal statements, the Bank asserts that the debt should be excepted from discharge pursuant to § 523(a)(2) subsection (A) which specifically excludes statements regarding the debtor's financial condition. Therefore, the Court will focus on statements made by the Debtor not concerning his financial condition.

The Debtor dealt almost exclusively with Janice Klever at the Bank. Ms. Klever testified that she cannot recall specifically asking the Debtor about differences on the financial statements concerning the number of cows and the value of equipment owned by the Debtor or about an additional $368,000 debt owed to M&I Bank. (Pl. Ex. 3 and 4; Tr. at 88-91.) Ms. Klever testified she was aware the Debtor was borrowing the funds to lease cows to Owen Mathieu and that the cows would be kept on the Mathieu farm along with other cows. (Tr. at 92.) The Debtor informed Ms. Klever that he and Owen Mathieu were "thinking about" forming an LLC, yet she never checked with the State of Illinois to determine if it had been formed. (Tr. at 93-94.)

The Bank loaned the Debtor $70,000 to construct a building on the Mathieu farm. Ms. Klever was aware the building was to be located on the Mathieu farm, but did not prepare any documents to provide for a lien on the farm, conduct a title search to ascertain ownership of the land or prepare a mortgage on the property. (Tr. at 94-95.) On the loan issued in June 2002 in the amount of $120,000 Mr. Klever testified she did

8

not inquire about the status of J&O Welcome meadows because she "would have relied on information that he gave me previously." In fact, she does not recall ever having a conversation with the Debtor concerning the legal status of Welcome Meadows. (Tr. at 99.) While the security documents prohibit sale of the collateral, the cows, Ms. Klever understood that cows would be sold on a regular basis as cull cows. (Tr. at 108.) Ms. Klever, however, never recalls the Debtor telling her he sold any cows or her asking him if he had. (Tr. at 108.) Additionally, the Debtor does not recall Ms. Klever informing him that he must tender any proceeds of culled cows directly to the Bank. (Tr. at 193-94.)

The Bank presented virtually no evidence of any representation the Debtor made. Ms. Klever testified to numerous conversations but cannot recall details, nor does she recall making specific inquiries. Similarly, Mr. Nosbisch could only recall one statement made by the Debtor in reference to the purpose of the last loan. (Tr. at 153.) While the Bank presented written documents concerning the financial condition of the Debtor, § 523(a)(2)(A) specifically excludes statements regarding the debtor's financial condition. The testimony of Ms. Klever established that she cannot recall the Debtor specifically telling her he sold cows. However, the financial statements both indicate some income would be derived from the sale of cull cows. (Pl. Ex. 2 and 4.) In addition, Ms. Klever lived on a dairy farm for 42 years, and her husband is a dairy farmer. (Tr. at 105.) As such, she understood that cull cows are those that are not performing and are taken out of the herd and sold. Some farmers include a percentage of cull cows in their financial plans. (Tr. at 106.)

This Court finds that the Bank did not establish by a preponderance of the evidence that the Debtor misrepresented any details of the operation or failed to disclose any details which would have amounted to a misrepresentation. The Debtor's

9

conduct likewise did not rise to the level of fraud. There was no evidence to support a finding of intent to defraud the Bank. The Court finds no intent on the part of the Debtor to mislead the Bank. Further, the Court finds that the information supplied by the Debtor should have prompted the Bank to inquire into matters which it considered important only after the fact. The evidence simply establishes that the Debtor borrowed money from the Bank in order to form a dairy farm business with Owed Mathieu. Unfortunately, the cows were not producing sufficiently and began to become ill and die.

Even if the Bank had established that the Debtor obtained the funds through the use of fraud or a misrepresentation, this Court finds that any reliance by the Bank was not justifiable. The Bank did not inquire as to discrepancies in financial statements or as to specifics regarding the formation of the LLC and the separate interests of the Debtor and Owen Mathieu. Therefore, this Court finds that the debt is not excepted from discharge pursuant to § 523(a)(2)(A).

### Count II - 523(a)(6)

Count II is brought pursuant to § 523(a)(6), which excepts a debt from discharge from a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." In order to except the debt from discharge, the Bank must establish that the Debtor: 1) intended to and caused an injury; (2) that the Debtor's actions were willful; and (3) that the Debtor's actions were malicious. *In re Passialis*, 292 B.R. 346, 352 (Bankr. N.D. Ill. 2003) (citing *Glucona America, Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 356 (Bankr. N.D. Ill. 2001) and *French, Kezelis & Kominiarek, P.C. v. Carlson (In re Carlson)*, 224 B.R. 659, 662 (Bankr. N.D. Ill.1998) (citation omitted), *aff'd*, No. 99 C 6020, 2000 WL 226706 (N.D. Ill. Feb.22, 2000), *aff'd*, No. 00-

10

1720, 2001 WL 1313652 (7th Cir. Oct.23, 2001)). Because a person will rarely admit to acting in a willful and malicious manner, those requirements must be inferred from the circumstances surrounding the injury. *Id.* (citing *Cutler v. Lazzara (In re Lazzara)*, 287 B.R. 714, 723 (Bankr. N.D. Ill. 2002)).

"Willful" for purposes of § 523(a)(6) means intent to cause injury, not merely the commission of an intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). The Debtor must have intended the consequences of his act. *Id.* at 62-63. Injuries either negligently or recklessly inflicted do not come within the scope of § 523(a)(6). *Id.* at 64.

As stated above, the facts establish that the Debtor attempted to enter into a dairy farm business with Owen Mathieu. That business did not succeed based upon the failure of some cows to produce milk and the death of numerous cows. The Bank produced no evidence which would indicate the Debtor had any intent to cause the Bank injury. Therefore, this Court finds that the debt is not excepted from discharge pursuant to § 523(A)(6).

CONCLUSION

The Bank did not establish by a preponderance of the evidence taht the Debtor obtained the debt through the use of actual fraud, false pretenses or false representation or by causing a willful and malicious injury to the Bank or its property. Therefore, this Court finds in favor of the Debtor on both counts. A separate judgment order will be entered consistent with the findings herein.

Dated: June 8, 2005

Manuel Barbosa
U.S. Bankruptcy Judge

11